## Doe *ex dem.* Martin *v.* King's Heirs.

The certificate of the register of the land office, that a map is a correct representation, is not sufficient to make it evidence under the statute. It must be certified to be a true copy of the original, and that the original is of record in the office.

A survey and map, made under the authority of the United States, is not admissible to change the survey of a Spanish grant, made prior to October, 1795.

The surveyor-general has no right to issue an order to alter original lines.

A commission to take testimony directed to A or B in the alternative is well directed.

If the commissioners certify that the witness was duly sworn, the presumption will be that he was sworn according to law.

An *ex parte* affidavit is not sufficient to prove that an original was lost, or that the instrument produced is a copy.

Where a charge asked for, is in part correct and partly erroneous, the court are not bound to separate it, but may refuse it altogether.

APPEAL from the circuit court of the county of Claiborne.

This was an action of ejectment.

The plaintiffs below claimed under a final certificate from the United States, in favor of one Pipes, and it was admitted, that Martin was the legal assignee of said certificate. The question involved was one of boundary between the plaintiffs on the north, who claimed according to the United States survey, and the defendants on the south, who claimed under a Spanish grant, and a survey by the Spanish authorities.

It appeared from the patent, that on the 14th day of August, 1794, the Baron Carondelet, acting governor of Louisiana and West Florida, granted to John Savage, one thousand arpens of land, situate in the district of Natchez, on a branch of Bayou Pierre, James's Run, at about forty-five miles distant and north of Fort Panmure, bounded east by the lands of Patrick Logan, and on the other sides by lands belonging to the crown. The claim was surveyed by the Spanish surveyor, Trudeau, and a diagram

11*

[Doe *ex dem.* Martin *v.* King's Heirs.]

thereof accompanied the patent. This survey was made, March 1, 1794. A certificate of confirmation by the board of commissioners, appointed under the act of Congress, was also read. It was dated June 25th, 1805, and said confirmation was made to Richard King, as the purchaser of Savage, and the present plaintiffs were admitted to be the sole heirs of said Richard King.

The declaration was for section 54, township 11, range 1, east, county of Claiborne.

During the progress of the trial, five bills of exceptions were taken to the opinions of the court, which contain all the questions arising in the cause.

On the trial, the lessors of the plaintiff offered to read in evidence a certified copy of a part of the township map of township No. 11, of range No. 1, east, to which map there was appended the following certificate: " Land Office, Washington. I certify, that the above is a correct representation of part of township No. 11, of range No. 1, east, according to the township maps in this office. Given under my hand and seal, this 14th day of July, 1828. B. C. Wailes, Register."

The court rejected said map on the ground of the insufficiency of the certificate, and the opinion of the court was excepted to by the plaintiffs.

After the defendants had closed their evidence, the lessors of the plaintiffs offered, as rebutting testimony in connection with the testimony of William Davis, a map and certificate, it being the survey of defendants' land made by the government of the United States. The survey was of the lands now claimed by defendants, which survey was executed on the 31st of December, 1805, by Charles Defrance. The certificate was in due form, made by the surveyor-general. Said map and certificate were offered, to set up a location different from the one claimed by defendants, and after defendants had closed their testimony in chief. The map and certificate were rejected by the court, to which opinion exception was taken by the plaintiff.

Davis was called to prove the survey to have been made by the government.

The plaintiffs also offered a map of survey and field notes, made of defendants' land, by one L. Stayton, under a commission from

[Doe *ex dem.* Martin *v.* King's Heirs.]

George Davis, surveyor-general, and by him approved. This survey was made in 1827. The surveyor declared in his certificate, that pursuant to instructions from the surveyor of public lands, south of Tennessee, dated September 24, 1827, he repaired to township 11, range 1, east, in the district west of Pearl river, for the purpose of surveying in whole, or in part, as should be found necessary, the Spanish claim of Richard King; that, as this claim had recently been surveyed by William Davis, a deputy-surveyor, and as it was believed his survey was correct, except as to quantity, Mr. Davis having included, he proceeds to say, that he was instructed to curtail the survey by running a new south boundary line, &c. This survey and the plat thereof were excluded from the jury by the court.

On the trial, the defendants offered in evidence the deposition of one James White, to which the plaintiffs objected, on the ground, that the commission for the taking thereof was directed in the alternative to " William Byrne, Esq., or to John Gibson, Esq.," and because it did not appear that the witness was sworn according to the laws of Louisiana, where said deposition was taken. The commission certified that the witness " was duly sworn." The objection was overruled and the deposition permitted to be read.

The plaintiff also offered in evidence a paper purporting to be the original report in Spanish, of the survey of the defendants' land, and the plat attached thereto. This paper was accompanied by the affidavit of James White, who alleges his belief, it is a copy; and that the said patent and survey were lost out of his possession.

It appeared from the deposition of one James White, that said grant was surveyed early in the year 1794, by a surveyor under the Spanish authority, by the name of Atchison. Witness saw the surveyor on the ground, did not know of any other survey of the grant by the Spanish government afterwards; did not know the course of the south boundary, but it included certain mounds on the land, and bore southeastwardly. Witness had seen a certain place on the land called the " Denham Fields," and thought the south boundary half a mile south of said fields. He also saw the surveyors on the eastern boundary, thought they crossed on

[Doe *ex dem.* Martin *v.* King's Heirs.]

the west side, near the top of a certain ridge, and believed they marked the line. Witness saw all the lines run, and believed the south boundary was closed. The country was a thick canebrake, and surveys were at that time carelessly made.

The plaintiffs also read in evidence, a survey and plat made by William Davis, under an order of the court. Said Davis being sworn, said he had long been a surveyor under the United States, was well acquainted with the location of section 54, township 11, range 1, had run its lines, as well as also, the lines of the adjoining survey of defendants' land, granted by the Spanish government in 1794. He testified that a plat, produced on the trial, exhibited correctly the tracts of both parties, the southern boundary line of the King tract, granted to Savage, and occupied by defendants, having written thereon, line run by William Davis, north 80° 12' east 117. 15 Ch. He stated the township line, between townships 10 and 11, exhibited on his plat, was distinctly marked, having the appearance of age in 1829, when he made the survey. That the lines of section 54 were distinctly marked from the township line, to, and a little beyond the intersections, with the line established by him as the southern boundary of the Spanish grant. Upon running round the Spanish grant, he found that, with the exception of the southern boundary line, the survey had been anciently made; that he traced the western line of said survey on the course called for in the plat attached to the grant, until he obtained the distance called for in the plat, beyond which point, he found no marked lines or trees, although the line up to that point was well marked. At that point, he found no corner trees, none being called for in the grant, or the plat attached thereto. In running the southern line of said Spanish grant, witness found no marked lines or trees, nor did he believe it had ever been closed, or the southern boundary run. Witness found the eastern line, well marked with ancient chops to the full distance called for in said plat, which brought him to the *termini* of said survey as run by himself, beyond which point, he found no marked lines on the course which the line had run.

Witness further deposed that, if the southern line of said Spanish grant were run north, 70 east, as claimed by King's heirs, instead of a northeasterly course, as run by himself, it would throw

[Doe *ex dem.* Martin *v.* King's Heirs.]

about three hundred acres more land into the survey than is called for in the Spanish grant, and would entirely change the figure of said survey, and lessen section 54, the same number of acres.

Witness further deposed that, the northern line of section 54, as run by himself, included a portion of the Denham Fields, as represented on the plat. That, at the time he made the survey, in 1829, King, the owner and occupier of the grant, was in company, and aided him in making said survey, and acquiesced and appeared satisfied with the location of the southern line of said tract, as then run by himself, north 80° 12' east, and as represented on his plat. Another witness proved, that the father of the present defendants was, at the institution of this suit, in possession of that part of section 54 included in the Denham Fields, and had continued in possession of the same up to his death, and his heirs had been in possession ever since.

The grant produced on the trial in the Spanish language had the course of north, 77 east, written on the plat on the southern boundary, instead of south, 70 east, as found on the duplicate.

It was also proved that Spanish surveys were inaccurate, and usually contained a surplus.

The plaintiff moved the court to instruct the jury as follows:

1. That if defendants' ancestor was in possession of part of section 54, at the time of bringing this suit, they must find for plaintiff, unless defendants held under paramount title.

2. That the map or the grant was a part of it, and no more land passed, than the lines, distances, and figures of said map will embrace.

3 That no location of the grant by Atchison can prevail against the location indicated by the grant and certificate of survey.

4. That the courses cannot be pursued beyond the distances called for, except to reach some monument called for, or known and referred to in the grant.

5. That the figure of the plat must be preserved and is evidence of boundary and location.

6. That if the southern boundary of Savage's grant is not marked, they must preserve the figurative plat and shape of the survey.

7. That if they believe running the south boundary south, 70

[Doe *ex dem.* Martin *v.* King's Heirs.]

east, instead of north, 70 east, will throw a greater quantity into the survey than called for, and essentially change the figure of the map; these are circumstances from which they may infer, that the course of said line is erroneously written on said map.

The court overruled all, except the first, and charged that the plat furnished no evidence of location, that the courses and distances written on the map controlled, although no lines or corners could be found: and that quantity was unessential; and on motion of defendant, the court charged—

1. When land is described by metes and bounds, quantity is immaterial.

2. When the lines can be found, the same shall govern.

3. When the lines cannot be found, the courses and distances must be pursued.

4. When all the lines and corners are found, except one corner, the courses shall be continued until the lines intersect.

5. Although King once thought a line was his, which was not, the true line should prevail when found.

6. To make an agreed line, both parties must consent, and King's opinion, that the line run by Wm. Davis was the true line, does not establish it, but the original line, when found, shall prevail.

7. The courses and distances laid down on the Spanish map are to be taken for the true courses and distances, until it be ascertained that they will not close, and then the above rules must govern.

8. The jury are to regard the courses and distances on the map and not the form.    And if they do not conform to the lines as found, the lines on the land must prevail.

Thrasher, for the appellant.

There are thirteen errors assigned by the appellant, copied from the several bills of exceptions taken to the opinions of the court below, during the progress of the trial, numbered from one to thirteen, inclusive; the correctness of which constitutes the subject of consideration for this court, and which will be examined in the order in which they stand, all having relation to the mode of ascertaining the true boundary between the parties.

[Doe *ex dem.* Martin *v.* King's Heirs.]

1. The first error assigned, was to the opinion of the court in rejecting the map and certificate first set out in the bill of exceptions, on the third page of the record, by B. L. C. Wailes, register of the land office, July 14th, 1828; which was a map and transcript legally certified by the proper officer having the custody of the land office records, of the land in controversy, and as such was made evidence by the Rev. Code, p. 190, ch. 24, and the 11th sect. of the act of Code, 510.

2. The second error assigned, was to the opinion of the court in rejecting the map and certificate secondly set out in the record on the fourth page, being the original survey of the land in controversy, by the government of the United States, under the act of congress, of the 3d of March, 1803, and which map or diagram was legally certified by G. Davis, the surveyor-general, the proper officer having the custody of the records of said office; and also to the opinion of the court in rejecting the evidence of Wm. Davis, a surveyor, sworn to prove it to be the survey originally made by the government of the United States, and to designate its boundary and marked lines on the ground. That the court erred in rejecting said map and certificate, is evident. By the 10th and 11th sections of the act of congress, of the 3d of March, 1803, Rev. Code, 510, it is made the duty of the surveyor-general, to survey, or cause to be surveyed, all the lands either public or private, in the then Mississippi Territory, and to make a record of the same. By the act of Congress, in Ingersoll's Abridgment, 360, such survey, when so made, is to be established as the true survey of the lands it purports to measure, and by the Rev. Code, p. 190, ch. 24, copies of such records are made evidence. Hence, the errors of the court below in rejecting said survey and the testimony of Mr. Davis.

3. The third error assigned, was to the opinion of the court in rejecting, as rebutting testimony, the report of a survey and map *thirdly* set out in the record, on the fifth page, of the land in controversy, made by Leolin Stayton, a deputy surveyor of the United States, approved by G. Davis, surveyor general of the public land, which was an error in the court, according to the authorities cited in the second assignment, to wit: Code, p. 5, 10, sect. 10 and 11. Ingersoll's Abr. 360, and Code, 190, ch. 24.

[Doe *ex dem.* Martin *v.* King's Heirs.]

4. The fourth error assigned, was to the admission in evidence of White's deposition, neither taken nor certified according to law. Code, 131, 132.

5. The fifth error, was to the opinion of the court in rejecting the paper purporting to be the original patent and report, in Spanish, of the defendant's land and plat thereto attached, set out in the record on page 17; it was error in the court to reject the original Spanish grant and survey, and to permit the defendant to offer in evidence, and read to the jury, instead thereof, a duplicate as set out in the record on page 12, the southern boundary of said original being marked north, 77 east, whereas the southern boundary of the duplicate, is marked south, 70 east, which changes the figure of the plot entirely, while north, 77 east, would retain the figurative plat represented by all the Spanish maps of said land on record. 1 Hardin's Rep. 370.

6. That the court erred in refusing to charge that the map or chart attached to the Spanish grant, was a part of said grant, and that no more land passed under said grant, than the lines, distances and figures of said map would embrace. 9 Cranch, 167, 173; 3 Marshall's Rep. 225–6; 1 Pirtle's Dig. 120; 5 Monroe's Rep. 161; 2 J. J. Marshall's Rep. 161. The southern boundary of the defendant's land never having been run or marked on the ground.

7. That the court erred in refusing to charge that no location of the lines and corners of the survey of the land referred to by said grant, made by Atchison, a private surveyor, could prevail against the location, as indicated on the grant of the Spanish government, and the report of the surveyor of the Spanish government, upon which said grant emanated, and who was a different person from Atchison. The official original must govern. 4 Mass. Rep. 408.

8. That the court erred in refusing to charge the jury that the courses of the lines of said survey could not be extended beyond the distance called for, unless it be to reach some natural or artificial boundary or monument known and designated, or referred to in said grant; none of which existed in the case. 2 Bibb's Rep. 493; 5 Monroe's Rep.; 2 J. J. Marshall's Rep.

9. That the court erred in refusing to charge the jury that the figure of the plat must be preserved, and was evidence of the

[Doe *ex dem.* Martin *v.* King's Heirs.]

original boundary and location of the land granted to John Savage. 9 Cranch, 173; 3 Marshall's Rep. 225–6; 2 Bibb, 493. The tenth, eleventh, twelfth and thirteenth assignments of error, and the principles involved in them, have been considered in the preceding assignments, and constitute such unquestionable errors as must reverse the judgment of the court below; all having reference to the true boundary between the parties and the rules and principles involved in ascertaining the same.

Holt, on the same side, cited 1 Pirtle's Dig. 120, 121, 123; 124 sect. 5; 125, sect. 11; 127, sect. 23 and 24, 131; Hardin's Rep. 370–1; 1 Marshall, 243; 2 J. J. Marshall, 161, 162, 163; 5 Monroe, 161–2. 3 Marshall, 226.

Montgomery, for the appellees.

1. As to the first assignment of error; the statute authorising copies of records of the land office, has not been complied with in the certificate, because it is not stated to be truly copied from the map appertaining to the office. Rev. Code, 190. 2. There had been a previous map before the jury. See bill of exceptions to the refusal to grant a new trial.

2. As to the second assignment; it does not appear that the survey was made under the directions of the surveyor south of Tennessee; nor that it was approved. Act of Congress of the 3d of March, 1803, sect. 14; Land Laws, 488; Rev. Code, 510.

3. As to the third assignment; the survey made by Stayton appears from its face to be a resurvey, and not in conformity with the tenor and intent of the certificate to R. King. Act of Congress of the 3d of March, 1803, sect. 11; 3 Johns. Rep. 269; 16 Johns. Rep. 257; the government having exercised its powers once in making the survey, had no right to alter the location after the titles of purchasers were complete, although there was a mistake. 16 Johns. Rep. 257; 3 Johns. Rep. 269. The title of King's heirs, was paramount to the title of the government. See the articles of agreement and cession between the United States and Georgia; Rev. Code, art. 1, sect 2, p. 503.

4. As to the fourth assignment; the deposition of James White was regularly taken according to the act of the legislature. Rev. Code, 131, sect. 116, 117. The commissioner is an officer of the

court, specially deputed to take the depositions, and required to certify and return it according to the laws of the state in which it is taken, and that court must presume he has so done his duty. There is no provision of the statute, requiring him to certify, under his hand and seal, and, therefore, that part of the commission is surplusage.

The 5th, 6th, 7th, 8th, 9th and 10th, are all one assignment; the first of which, the court in substance gave in the 1st, 2d, 3d and 4th instructions moved for by the defendant. As to the 6th assignment; the marked trees and other monuments on the land, is the survey; the surveyor's return is only evidence, and may be controlled by the marks on the land. Wharton's Dig. 405; 2 Yeates, 311; 4 Serg. & Rawle, 462; 5 Serg. & Rawle, 215.

In ascertaining old surveys, the rule is, that the lines and courses, as marked on the land, shall control the calls for course and distance.

2. The courses and distances shall be followed, when there are no lines, or corners and monuments.

3. When the courses and distances will not close the survey, and it becomes necessary to depart from either the course or distance, the distance shall yield, and the lines be extended or limited accordingly.

4. When all the lines and courses of a survey are found but one, the last two lines must be extended according to the courses until they intersect, if they will; but if they will not intersect, then there must be a departure from course and distance, so as to close the survey and preserve the figure of the survey. Pirtle's Dig. 113, 114, 115; 6 Littell's Rep. 93; 3 Peters's Rep. 96; 9 Cranch, 173.

Quantity is an immaterial description in a deed, when the land is also described by metes and bounds. 15 Johns. Rep. 471; 17 Johns. Rep. 146; 6 Mass. Rep. 131; 2 Binn. Rep. 523; 1 Binn. Rep. 246.

An old location, &c., shall prevail, notwithstanding mistakes. 3 Johns. Rep. 269.

Mistakes in an original survey cannot be corrected by the government after the rights of private persons have accrued. 16 Johns. Rep. 257.

[Doe *ex dem.* Martin *v.* King's Heirs.]

· A survey adopted by the government, though not made by a deputy, may be had. 2 Yeates's Rep. 245; 2 Serg. & Rawle, 557; Wharton's Dig. 403.

A survey by a stranger for the proper deputy, and by him approved and certified, is evidence; 6 Serg. & Rawle, 137; therefore, Atchison's survey is of as much validity as if made by Trudeau in person. 3 Peters's Rep. 338, 340.

· A map of the land conveyed on the deed, is as much a part of the description of the land, as if it were incorporated on the deed. 17 Mass. Rep. 207.

· The law requires the lines should be run and marked, and the presumption is, that it was done, and when the marks cannot be found, the presumption is, they have been defaced or destroyed. Yet if the survey was not made, as it was the fault of an officer of the government, over which the party has no control, it would be unjust that the owner should be injured thereby. The inquiry, therefore, is where the line was, or ought to have been run. 1 Pirtle's Dig. 114, 117.

Mr. Chief Justice Sharkey delivered the opinion of the court.

The plaintiff instituted this action of ejectment, in the circuit court of Claiborne county, for the recovery of the land in question, and after verdict and judgment against him, appealed to this court. The plaintiff claims by virtue of a title acquired by entry under the United States, and the defendants claim under a Spanish patent, legally and fully executed. It is, however, a question of boundary, both titles being unquestionable.

The questions of law on which the decision must turn, are brought before us, by five bills of exceptions taken on the trial.

As all the points made before the court below, are covered by the assignment of errors, they can be more conveniently disposed of by considering them in the order of assignment.

1. It is assigned for error, that the court improperly refused to permit the lessor of the plaintiff to read, in evidence to the jury, the map and certificate first set out by bill of exceptions, and the record of township 11, range 1, east, certified by B. L. C. Wailes, register of the land office, 14th July, 1828. This map and the certificate thereto attached, were offered under the provisions of

[Doe *ex dem.* Martin *v.* King's Heirs.]

the statute contained in the Rev. Code, 190; which declares, " that hereafter, copies of the records appertaining, and belonging to the land offices of the United States, established in this state, duly authenticated by the proper officer having charge of said records, shall be admitted as evidence in suits depending in the courts of this state, in all cases when the original or sworn copies could be admitted, without further proof," &c. It is not necessary to inquire whether the original record would be evidence; the objection to the certificate rests upon its face, and is readily perceived by comparing its language with the obvious meaning of the statute, as indicated by the phraseology. The certificate attached to the map, is in these words: " Land Office Washington. I certify, that the above is a correct representation of part of township No. 11, of range No. 1 east, according to the township map in this office." There are two manifest objections to this certificate; 1. it does not certify that the map to which it was attached, was a true copy from the original; and 2. it does not state that the original was the map of record in the office. It is certified to be a representation; and there is a wide difference between a copy and a representation; and even this representation, is only of a part of a map in his office. The language of the statute admits of no latitude: nothing can be evidence under its provision, but copies of the record pertaining to the office. It is altogether improbable, that this diagram is a copy from the official map. The part of the township it represents, contains a number of old surveys, not run by direct cardinal lines, as are the surveys under the laws of the United States, and none of them have either course, distance, or quantity of acres designated; without which it would at best be very uncertain evidence. When evidence is offered under a statutory provision, which would not be admissible at common law, it must come within the statute. This certificate does not, and was properly rejected.

2. It is secondly assigned as error, that the court rejected, and would not permit the lessor of the plaintiff to introduce and read to the jury, the map and certificate secondly set out in the bill of exceptions, being the survey of *defendants'* land, made by the government of the United States, certified by the surveyor general in connection with the testimony of William L. Davis, a

[Doè *ex dem.* Martin *v.* King's Heirs.]

surveyor sworn to prove it to be the survey made by the government, and to designate its boundary, and marked lines on the ground.   By referring to the second bill of exceptions on which this assignment is predicated, we find that the evidence rejected is a certified copy of a survey of the land of Richard King, being the same now claimed by the defendants, made by Charles Defrance, on the 31st of December, 1805.   No objection is taken to the certificate; it is in due form, made by the surveyor-general.

Its admissibility depends on a different ground, being objected to as insufficient or incompetent, to show the location of King's grant.   It was offered after the defendants had closed their evidence, as rebutting testimony, for the purpose of showing a location different from the one set up by them, and by that means to remove the confliction of boundary, produced by the state of proof made out by defendants. It becomes material, therefore, to inquire what the defendants had proved in regard to the identity of their land, and whether their proof could be properly rebutted by the testimony offered for that purpose.   In the pursuit of this inquiry, we are unavoidably forced to travel back to the origin of the title of each party, but especially that of the defendants, who resist the evidence as an innovation on rights vested prior to the making of the survey.   They claim by virtue of a Spanish patent, legally and fully executed, bearing date on the 14th of August, 1794. The validity of such a title, admits of no question, if the holder was a citizen of the Mississippi Territory on the 27th of October, 1795, in which case his title was made complete, by the articles of cession between Georgia and the United States.   After this territory was ceded by Georgia to the United States, commissioners were appointed for the purpose of settling the various imperfect titles to land, which titles, other than those provided for by the second article of cession, depended for their validity on the acts of congress.   All claimants were required within a certain time, to submit their claims to the commissioners, and their action was to be final.   Amongst other claimants, those holding Spanish patents legally and fully executed prior to the 27th of October, 1795, were also required to lay their claims with the patent as evidence thereof, before the commissioners; but the power of the

12*

[Doe *ex dem.* Martin *v.* King's Heirs.]

commissioners was limited as to them, not, it is true, expressly by the act of congress, but necessarily so from the character of their claim. As to all such claimants, there was but one inquiry to be made by the commissioners, to wit: was the claimant an actual settler of this territory on the 27th of October, 1795? If so his title was complete. The commissioners gave to these claimants, as well as others, a certificate of confirmation, which in fact amounted to nothing more than a certificate that they were actual settlers at the time mentioned, although it might profess, as it usually does, to confirm the claimant in his title. This was the only purpose for which they were bound to present their claims to the commissioners. King presented his claim and patent, and was confirmed as assignee of John Savage, to whom the original patent was granted, which certificate is set out in the record. Prefixed to his patent, is a plat of the land granted, with the courses, distances, and quantity of acres marked thereon, and the patent calls for land on a branch of the Bayou Pierre, called James Run, at about forty-five miles distant, and north of Fort Panmure. He thus presented an unquestionable title, which accrued on the 14th of August, 1794, long before the United States had any right of soil in this territory. He also produced in evidence, the certificate of survey on which the patent was based, bearing date the 1st of March, 1794. In addition to this, he proved by a witness, that a survey of the land was made in the spring of 1794. This discloses enough of the case to test the admissibility of the testimony. We have proof of an actual survey, a certificate that a survey was made, and a complete Spanish patent, all executed in 1794. The patent itself presupposes a survey. It was a grant of land according to the description it contained. The location was shown by the general calls, the particular situation by the calls for course and distance, from a beginning point. The object in introducing the certificate of Defrance's survey, was evidently to change the location thus indicated, by showing that he, as a surveyor of the government, had laid it off differently in 1805. His map or plat does not correspond with the original one. Supposing him to have been a surveyor authorised by the government, was there any validity in his survey, so far as it professed to fix the lines of King, or in other words, had the govern-

[Do'e *ex dem.* Martin *v.* King's Heirs.]

ment any right to change the location of King's land?  If not, Defrance's survey was inadmissible.  It is a point too plain to admit of discussion, that the government had no power to change the location of King's land, if it ever had been located.  He claimed by a complete title not derived from, nor in any way depending on the action of the government.  The same act which passed the soil to the United States, confirmed him in his rights. *How could the United States change a location fixed under a title vested long before they had a right of soil,* which was especially provided for, in the treaty by which they acquired the right of soil?  such a position could not be maintained without violating fixed principles, and overruling all the adjudicated cases.

It is concluded, however, for the plaintiffs, that the survey made by Defrance, was an official survey, made in accordance with the provisions in the 11th sect. of the act of congress, of March, 1803, and that the certificate of George Davis, surveyor-general, being in due form prefixed to a copy of the map as recorded, was admissible evidence under the statute.  That, inasmuch as King was bound to present his patent to the commissioners, and obtain a certificate, the act of congress applies as well to his claim as to others.  That, as the surveyor-general was required to have surveys made of all private claims for which certificates had been granted, the survey when so made became binding.  The extent to which this reasoning is carried, is *not supported by the act* referred to.  The government had but lately acquired the domain in this territory, and was desirous of disposing of it to the citizens or those who should wish to become citizens.  For the purpose of accomplishing that object, this act was passed.  In addition to this object, congress in its bounty, chose to make provision for certain persons claiming lands by virtue of warrants, or orders of survey obtained from the British government of West Florida, or from the Spanish government, by which they could be confirmed in their titles.  The second section also, provides for a grant to actual settlers, who resided in the territory, when it was finally evacuated by the Spanish troops, and the third section gives a right of pre-emption to actual settlers, at the time of passing the act.  Thus we see that, in addition to those claiming by Spanish patent, two other descriptions of private claims were recognised

and provided for by the first and second sections of the act. These claimants were bound to present their claims to the commissioners, and obtain certificates of confirmation. In regard to claimants under the second section, the commissioners could only grant a certain quantity, to wit: six hundred and forty acres; the others were to be confirmed according to the warrant or order of survey. Before a donation claim could be complete, it was, of course, necessary that it should be surveyed, and this was to be done before the vacant lands were surveyed. These several provisions present to view, three distinct classes of claimants. First, those claiming under Spanish patents, legally and fully executed. Secondly, those claiming under a British or Spanish warrant, or order of survey; and thirdly, those claiming a donation of six hundred and forty acres. The public lands could not be sold until they were surveyed, and they could not be surveyed, until a survey was made of the private claims, for the purpose of ascertaining which was public land, and which was private; and as congress was, by the act referred to, providing for the survey and sale of the public lands, it was also necessary to provide the means of ascertaining the private lands. Hence, the eleventh section declares, "that the lands for which certificates, of any description whatever shall have been granted by the commissioners in pursuance of this act, shall, as soon as may be, be surveyed under the direction of the surveyor of the lands of the United States abovementioned, in conformity to the true tenor and intent of such certificates." The act then proceeds to provide for the survey of all other lands to which the Indian title had been extinguished into townships, &c. This section does not pretend to confer power to change actual locations. In regard to claimants under Spanish patents, no such power could have been conferred by congress. These surveys were to be made according to the "true tenor and intent of such certificates," the plain meaning of which is, that the original should be followed where one had been made. Defrance, therefore, had no power under the act to change the location of King's claim, and when he undertook to do so, he not only transcended his authority, but went beyond even the power of congress; and as to King, his official act had no validity. It might have been proper evidence to show a survey of public lands, but not of private claims. The govern-

[Doe *ex dem.* Martin *v.* King's Heirs.]

ment, as regarded King's claim was a mere stranger. This survey and certificate were, therefore, properly rejected.

Thirdly. The next error assigned is, that the court erred in ruling out, and refusing to permit the lessor of the plaintiff to introduce and read to the jury as rebutting testimony, the map of a survey made by Leolin Stayton, a deputy-surveyor, approved by George Davis, surveyor-general. By reference to the bill of exceptions, we find that the survey in this assignment alluded to, was made in September, 1827, and is not only liable to all the objections taken to Defrance's survey, but in addition, bears its own condemnation on its face. The surveyor certifies, that he repaired to the land of Richard King, and as it had been recently run out by William Davis, a deputy surveyor, he thought proper to pursue the lines made by Davis, except as to quantity, and in order to give King his exact quantity, as he was ordered, he curtailed the survey of Davis. Such a certificate, and such an order from the surveyor-general, if such he had, present no claim to the serious consideration of this court. The surveyor-general had no power to issue an order to alter original lines.

Fourthly. The fourth matter assigned as error is, that the court overruled the objection made to the reading, as evidence on the part of defendants, the deposition of James White. Two objections were taken at bar to this deposition. 1. That the commission was improperly directed, and conferred no power on the commissioner to take the deposition; and 2. That it was improperly certified. By an examination of the commission, as it is set out in the bill of exceptions, we find that it was directed "to William Byrne, Esq., or to John Gibson, Esq.," in the alternative, and in this it is said to be erroneous. This objection cannot prevail. By the appointment, the commissioner becomes an officer of the court of its own creation, and it was competent that the court should, by this means, create one or more officers, and empower them to act collectively or individually. This is the usual mode of directing commissions, and there can be no substantial difference between directing a commission to A and B, or either of them, and a direction to A or B. In the one case, they are authorised to act jointly and severally, and in the other, severally only. No uncertainty is created by adopting the latter mode. The

[Doe *ex dem.* Martin *v.* King's Heirs.]

objection to the certificate is, that it does not appear that the witness was sworn according to the laws of Louisiana. The commissioner certifies, that the witness was " duly sworn," which we think must be understood to mean, that he was properly sworn. The commissioner being the officer of the court, a presumption is to be indulged, that he acted in conformity to law. That he certifies, in the capacity of a justice of the peace, only shows that, he supposed the commission was directed to him in his official capacity, which, in fact, was not so, and that part of the certificate, is mere surplusage. In other respects, the certificate conforms to the statute. The deposition was not taken *de bene esse*, but to be read in chief under the 116th section of the circuit court law.

. Fifthly. The next error assigned is, that the court ruled out the paper purporting to be the original report in Spanish of the survey of defendants' land, and the plat attached thereto. This document was introduced with the affidavit of James White attached, who says, that he verily believes it to be a copy, and that the said patent and survey were lost out of his possession. This affidavit being *ex parte* was not sufficient to establish either the loss of the original, or the fact that the instrument produced was a copy. This brings us to the charges asked of the court, and refused, which are also set out in the fifth bill of exceptions, and will be separately noticed.

The court gave the first charge asked for, but, it is said, refused to give the others.

1. The plaintiff requested the court to charge the jury " that the map or chart attached to the Spanish grant to Savage, is a part of said grant, and no more land passed under said grant, than the lines, distances, and figures of said map will include.

.This, as an entire charge, would have been too broad, and was, therefore, properly refused. It is true that a map or plat attached to a grant, may be considered a part of it, for the purpose of supplying the place of description, when the map is referred to in the grant, but the courses, distances, and other particulars appearing on the plat, are to be regarded as the true description. 17 Mass. Rep. 211. It is evident that the plaintiff did not intend this charge to apply to the courses, distances and calls on the map, but to the shape merely, otherwise the court was requested to

[Doe *ex dem.* Martin *v.* King's Heirs.]

give repugnant and contradictory charges. The calls on the map for course and distance, are what the plaintiff seems most desirous to disregard, as appears by the position taken in argument, and also by the subsequent charges requested, which seek to establish the figure of the map, stripped of the given course and distance. Hence the court was not asked to instruct the jury that the map, and the courses and distances, and other particulars appearing on it, were a part of the patent. But even admitting that the court could have properly given the first member of the charge, to wit, that the map was a part of the patent, yet, it would have been error to have given the whole of it, and we do not conceive that the court was bound to separate a charge which was asked entire, and give that part which was unobjectionable. It would have been error to charge that no more land passed than the lines, distances, and figure of the map would include. Quantity cannot control course and distance. It is regarded as an immaterial description, unless it be the material part of the grant, and the only description which leads to a certain conclusion, as to what was intended to be conveyed. Where metes and bounds, or courses and distances, are called for, the quantity of land which they embrace is immaterial. 15 Johns. Rep. 471; 5 Mass. Rep. 131.

2. The next instruction prayed and refused, is as follows. "That no location of the lines and corners, of the survey of land referred to by said grant made by Atchison, can prevail against the location, as indicated on the grant of the Spanish governor, and the report of the surveyor of the Spanish government, upon which said grant was based." The application of such a charge is left doubtful. Some evidence was before the jury of a survey made by Atchison in 1794, but that evidence did not tend to place the survey in conflict with the report of the survey made by the surveyor under the Spanish government. On the contrary, it was supposed by the defendants' counsel, that the survey was made by Atchison as deputy, and reported by his principal to the government, and that it was the survey on which the patent emanated. It is probable, that this instruction was one of several prepared by counsel, under an impression that the one above noticed would be given, and that the plat would be regarded as evidence of the survey returned. This is inferable, as Atchison

[Doe *ex dem.* Martin *v.* King's Heirs.]

speaks of a line which would not be covered by the map, if its shape alone were to be regarded. If it was designed to sustain such a relation to the charge first refused, it became irrelevant when its foundation was swept from under it, and it was not error to refuse it. The state of the case before the court, laid no foundation for such instructions, and a charge must be pertinent to constitute error in refusing it.

3. " That the courses of the lines of said survey cannot be pursued beyond the distances called for, unless it be to reach some natural or artificial boundary, or monument, known and certified, or referred to, in said grant." The instruction here asked, raises the question directly, as to which shall prevail, course, or distance. That which is the most certain should control. Both are more or less uncertain, and must yield to natural objects. In the case of Preston's Heirs *v.* Bowmar, 6 Wheaton, 580, Judge Story holds this language: " It may be laid down as a universal rule, that course and distance yield to natural and ascertained objects. But where these are wanting, and the course and distance cannot be reconciled, there is no universal rule that obliges us to prefer the one or the other. Cases may exist in which the one or the other may be preferred upon a minute examination of all the circumstances." The same conclusion is also adopted by other authorities, and it must, from the nature of the evidences of course and distance, be the true one. We cannot arrive at absolute certainty by either, and to give a preference to either as a general rule, would lead to difficulty. In the present case, if we take the courses called for, as run out by the surveyor Davis, by adhering to distance, we are stopped on the east, and south boundary, some distance before the lines will close, and thus, the survey would present one open line; and it is a rule, without exception, that a survey must be closed in some way or other. If this can be done by following the course the proper distance, then it would seem that distance should prevail, but when the distance falls short of closing, and the course will do it, the reason fails for observing distance. 1 Pirtle's Dig. 115–16; Ibid. 124, sect. 9; 825, sect. 13; 126, sect. 18. The charge as asked, seems to imply a supposition that the courses were to be followed. If so, it was proper to refuse it, for the reasons above given.

[Doe *ex dem.* Martin *v.* King's Heirs.]

4. The court was next requested to charge the jury " that the figure of the plat must be preserved, and is evidence of the original boundary and location of the land granted to John Savage.

This proposition has been much relied on in argument, and manifestly considered as entitled to great weight; for, in a varied shape, it is interwoven into several of the instructions asked of the court. Being evidently considered by counsel as a material question in the case, we shall give it all the weight to which we consider it entitled. In doing so it is proper to notice, in connection with it, the charge which was really given by the court. The court after refusing the particular charges requested, remarked generally to the jury, " that it was not necessary to preserve the figure of the plat, and that the plat furnished no evidence of location, or original position of the survey; that the course and distance, written on the map controlled, and must be followed, although no marked lines or boundaries, could be found to correspond, and that the quantity which the courses of the plat might include, was wholly immaterial." This general charge, taken separately from the case may seem too broad, but it must be construed, as all charges should be, with reference to the state of the case before the court. Under such circumstances as were presented, it was no doubt given, and so we must consider it. The charge asked, is evidently confined to the mere shape of the map as contra-distinguished from the courses called for. That the plat on the patent constituted a part of it, is not denied, and we find, in many of the authorities, that resort to the map is justified for the purpose of *ascertaining* the location. But the ground here taken in its broad and unqualified sense, that the figure of the map must be preserved, is a position which I do not think maintainable. The great object to be attained in controversies of this description, is *identity.* Land passes by grant, according to the lines actually seen upon it, whether those lines correspond with the courses and distances, or not. Certain proof of the lines as seen, is the best evidence of identity. In the absence of this certain proof, other evidence must be resorted to, and hence it is, that fixed monuments, and marked lines, are considered as the next best evidence. When these are not to be found, courses and distances must govern, and where the courses and distances

[Doe *ex dem.* Martin *v.* King's Heirs.]

are irreconcilable, or repugnant to calls for known monuments, or water courses, then the map may be called in, to aid in ascertaining the location. In short, whatever is most certain shall govern and control that which is less certain. A mere representation of shape, or figure on a map, is the most uncertain of all proofs of the actual location of the land intended to be represented. In fact, figure alone conveys to the mind no certain idea of identity. The same figure may be protracted with its angles to all points of the compass, and still the shape is preserved; but when there are other leading objects to point to the location, the shape on the map may regulate the external lines. This was the case in M'Iver *v.* Walker, 9 Cranch, 173. The map represented the land as lying on both sides of Crow Creek, and the creek was the object of notoriety, which fixed the location. In Alexander *v.* Lively, 5 Monroe, 159, the plat was used to explain a contradiction between the patent and certificate of survey. The rule as laid down in the case of Davis *v.* Rainsford, is the true one, to wit: that the map, courses, distances, and other particulars appearing thereon, when referred to by the grant, become a part of it; and I apprehend, that no case can be found, in which the mere figure of the map has been held to control the calls on it. As the line of the map, in its relative situation with the other lines, appears to run a course different from that called for, the call for course, and not the apparent course of the line, must control. The court was not asked to charge that the map, with the field notes, and particulars thereon, must be observed, but the figure of the map merely; and, for the reasons given, the charge was properly refused.

5. That if the jury believed, from the evidence, that the southern boundary of Savage's survey is not marked on the grounds, that in establishing said lines, so as to ascertain the confliction, they must preserve the figurative plat and shape of the survey.

This is an additional effort to preserve the shape of the map, and the remarks already made are applicable to it.

6. The only remaining instruction asked for, is in these words: "That if they believe the running of the southern boundary line of Savage's tract, south, 70 east, instead of north, 70 east, would

[Doe *ex dem.* Martin *v.* King's Heirs.]

throw into said tract a much greater quantity of land than that called for in the grant, and would also essentially change the figure of said tract, as indicated by the plat accompanying the grant, that these are circumstances from which they may infer that the course of said line is erroneously written on said map.'' The principles here involved have already been considered. Both quantity and shape, when taken in connection with courses and distances, are believed to be so immaterial, as not to justify the inference desired.

It is unnecessary that we should notice particularly the charges asked by the defendant. Most of them fall clearly within the principles already noticed, and those which do not present clear and undeniable legal propositions. Thus the numerous points raised, have each been particularly noticed in their order, and it is believed that none of them would justify a reversal of the judgment. They have been presented to us more as mere abstract questions of law, than with a reference to their application to the evidence in the case, and consequently, the merits of the several boundaries, as contended for by each party, have not come fairly before us. Had the question been fairly presented as to which was the true boundary of Savage's grant, we should not have had much difficulty in deciding it. The question of the true boundary has been overlooked, in a zealous effort to establish one that can exist only in imagination, unsupported by either law or testimony.

Judgment affirmed.